# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA

## BUTTE DIVISION

| | |
|---|---|
| FARMHOUSE PARTNERS LIMITED PARTNERSHIP,<br><br>Plaintiff,<br><br>vs.<br><br>Multi-Housing Tax Credit Partners XXX,<br><br>Defendants. | CV-21-48-BU-BMM<br><br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

The Court heard this matter, sitting without a jury, on May 31, June 1, 2, and 3, 2022, in Butte, Montana. Michael Black, Trent Gardner, and Sydney Best represented Plaintiff Farmhouse Partners Limited Partnership ("Farmhouse"). Edward Quigley, Cathy Moses, and David Wagner represented Defendant Multi-Housing Tax Credit Partners XXX ("MHTCP"). Witnesses testified for each party. The Court considered designated excerpts from the following witnesses' deposition transcripts: William Dabney; Susan Burrows; Stephen Strain; Nicholas Bridges; and MHTCP's Rule 30(b)(6) designee, Jeffrey Sussman. The Court also admitted and considered designated written discovery responses. (Doc. 157.)

The parties have participated in a settlement conference. This settlement effort failed to resolve the dispute.

Having heard the evidence and reviewed the trial briefs of both parties, the Court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. The events leading to this action took place primarily in Bozeman, Montana.

2. The parties operated through a series of limited liability companies and partnerships to minimize personal liability, access tax advantages, and facilitate transfer of ownership interests. A contentious divorce proceeding involving one of the parties behind these limited liability companies and partnerships set off discord. A brief discussion of these entities, the parties forming them, and their history sets the backdrop for the dispute before the Court.

### Background on the Parties

3. William Dabney ("Dabney") formed The Dabney Company, a Montana corporation, in 1994. Trial Tr. vol. 1, 72:7-73:1; (Doc. 157 at 3.) Dabney always has been its sole shareholder. *Id.* The Dabney Company operated in the real estate sector with a specialty in low-income housing projects and the tax benefits associated with these projects. The Dabney Company also formed Farmhouse, a Montana limited partnership, in 1994 with Kendrick Wilson, III ("Wilson"). Trial Tr. vol. 1, 74:8-19; (*see also* Doc. 171-1 (Ex. 14)); (Doc. 157 at 3.)

4. Farmhouse's governing limited partnership agreement (Doc. 171-1 (Ex. 14)) provides that partnership profits and losses be shared such that The Dabney Company, as General Partner, receives 90 percent and Wilson, as Limited Partner, receives 10 percent. Trial Tr. vol. 1, 74:14-19; (*see also* Doc. 157.) Dabney acted on behalf of Farmhouse during the events in question.

5. MHTCP is a California limited partnership. (Doc. 157 at 3.) Jeffrey Sussman ("Sussman") served as the face of MHTCP during most of its interactions with Farmhouse and Dabney relevant to this dispute. (Doc. 28-17); (Doc. 172-120 (Ex. 501.)) Multi-Housing Investments, LLC, a Colorado limited liability company, serves as the General Partner of MHTCP. Trial Tr. vol. 3, 683:16-18; (Doc. 157 at 3.) Multi-Housing Investments, LLC, and its affiliates typically invest in several hundred LHTC projects across the country at any time. Tr., vol. 3, 684:22-685:18, 687:16-23.

**Origins of the Bridger I Partnership**

6. Farmhouse, with the Dabney Company as its General Partner, entered into a limited partnership agreement with Dabney, acting in his personal capacity, on or about April 17, 2002. Farmhouse Partners - College Limited Partnership ("Bridger I Partnership") emerged as the new entity. The Bridger I Partnership developed a Low-Income Housing Tax Credit ("LIHTC") project that came to be known as the Bridger I Project in Bozeman, Montana.

7. Investors in the LIHTC industry commonly use the Limited Partner legal structure to develop housing projects and operate them thereafter. The investor becomes the Limited Partner and provides development capital for the housing project. Trial Tr., vol. 1, 56:4-13. The Limited Partner receives in exchange valuable tax credits and tax losses from the LIHTC project that could be applied to their other business endeavors. Trial Tr., vol. 1, 61:9-21. These tax benefits become the means by which a Limited Partner obtains most of its anticipated return on any LIHTC investment. Trial Tr. vol. 3, 687:1-11.

8. Farmhouse served as the original General Partner in the Bridger I Partnership. Dabney, in his individual capacity, served as the Limited Partner. (Doc. 172-52 (Ex. 402)); Trial Tr. vol. 1, 107:20-108:1, 108:10-109:7.

9. Farmhouse and MHTCP's predecessor-in-interest executed the Amended and Restated Agreement of Limited Partnership of Farmhouse Partners College - Limited Partnership ("LPA") on September 5, 2002. (Doc. 172-3 (Ex. 4.)) Also on September 5, 2002, Dabney, in his individual capacity, withdrew as Limited Partner in the Bridger I Partnership and assigned the Limited Partner interest to Multi-Housing Investments, LLC. (Doc. 172-3 at 5, 90 (Ex. 4)); Trial Tr. vol. 1, 114:6-17.

10. The parties amended the LPA on November 25, 2002, to admit MHTCP as the Limited Partner. (Doc. 172-4 (Ex. 5)); Trial Tr. vol. 1, 42:5-7.

11. The LPA includes no provisions to impose any duties upon Dabney, in his individual capacity, after Dabney withdrew as the Limited Partner and Multi-Housing Investments, LLC substituted in by assignment. (Doc. 172-3 (Ex. 4.))

12. Neither Dabney nor The Dabney Company are direct parties to the LPA or the Bridger I Partnership. (Doc. 157); (Doc. 172-3 (Ex. 4)); (Doc. 172-4 (Ex. 5)); Trial Tr. vol. 1, 116:14-117:12. The plain language of the LPA and the undisputed testimony demonstrate that Farmhouse and MHTCP are the only parties to the LPA. *Id.* Farmhouse, as previously explained, operated as a limited partnership with the Dabney Company as the General Partner and Wilson as the Limited Partner. (Doc. 157.)

**The Limited Partnership Agreement**

13. The LPA contains the entire understanding between Farmhouse and MHTCP as it relates to the Bridger I Partnership. (Doc. 172-3 at 88 (Ex. 4 at § 17.8.)) The LPA supersedes all other prior agreements, understandings, and letters of intent between and among the parties and their affiliates or representatives with respect to the subject matter of the LPA. *Id.*

14. Montana law governs construction and enforcement of the LPA. (Doc. 172-3 at 20, 87 (Ex. 4 at § 17.1.)) The LPA provides that the Bridger I Partnership will remain in full force and effect until December 1, 2057. (Doc. 172-3 at 22, 81 (Ex. 4 at §§ 2.5, 15.1)); Trial Tr. vol. 3, 614:20-615:5.

5

15. The LPA provides MHTCP with the right to assign its Limited Partner interest without the prior written consent of Farmhouse in its role as the General Partner. (Doc. 172-3 at 76 (Ex. 4 at § 12.1.)) By contrast, Farmhouse could assign all or any part of its General Partner interest only with the prior written consent of the MHTCP. (Doc. 172-3 at 50, 60, 76 (Ex. 4 at §§ 5.2H, 7.3E, 12.1B.))

16. Under the LPA, MHTCP, as the investor entity, contributed the initial capital to develop the project. Trial Tr. vol. 1, 56:4-13. MHTCP made approximately $3.9 million in capital contributions to the Bridger I Partnership. These contributions constituted the majority of capital needed to fund the Bridger I Project. (Doc. 172-3 at 22-35 (Ex. 4 at § 3.2)); Trial Tr. vol. 4, 872:20-873:4.

17. MHTCP, as the Limited Partner, then received the valuable tax credits and tax losses, or depreciable costs, that the project has yielded. Trial Tr. vol. 1, 61:9-21. Limited partners in LIHTC projects generally do not expect cash distributions due to the value of these expected tax benefits. Trial Tr. vol. 1, 62:7-21.

18. MHTCP, as the Limited Partner, played no role in the day-to-day management of the Bridger I Project. The LPA instead sought to achieve MHTCP's economic objectives and its anticipated return on investment. Trial Tr. vol. 3, 686:14-687:12. MHTCP specifically bargained to receive 99.99%

6

of the tax credits, profits distributed from cash flow, and losses generated by the Bridger I Project. (Doc. 172-3 at 70-76 (Ex. 4 at §§ 11.1A, 11.1C, 11.2A(10), 11.3H.))

19. The General Partner runs the day-to-day operation and management of the LIHTC project. These duties include ensuring that the LIHTC project does not run afoul of IRS regulations; that the property is well maintained; "that [the General Partner] manage[s] the tenant relationships properly; and that [the General Partner] . . . [is] doing everything . . . to make sure [there is no] . . . negative public exposure of [the] limited partner." Trial Tr. vol. 1, 56:14.

20. Farmhouse, as the General Partner, also received partnership administration fees and incentive management fees in exchange for day-to-day management. Trial Tr. vol. 1, 138:20-139:16; (Doc. 172-3 at 52 (Ex. 4 at § 6.2.))

**Economic Returns to MHTCP under the LPA**

21. MHTCP's corporate designee Sussman testified as to MHTCP's expectations under the LPA. Trial Tr. vol. 4, 881:6-884:22. Sussman explained that the LPA sought to achieve certain economic benefits for MHTCP:

> Q: So my question is what are the rights that are a focal point for the limited partner investing in Bridger I?
>
> A: Right. Well, obviously, the tax credits are a main component of that, and there also are losses. But there are economics too, and they can be very significant. It varies from deal to deal, and we've got some properties in partnerships that are terrible. They are operating poorly. In

fact, we have to make loans to the partnership to be able to keep paying its mortgage so that the property isn't lost to foreclosure. And then there's others that do very well, and a lot of equity builds up, and they become very valuable.

So the limited partner [MHTCP] has a bundle of rights, just like the general partner does. They include the tax credits, include the losses, includes its share of cash flow, includes its share of the equity, just like the general partner has. There's a business deal that's struck, and each side has benefits that it is entitled to.

Q: And where are those benefits laid out for Bridger I?

A: They are in the [LPA], primarily in Article 11, 11.1 and 11.2.

. . . .

[T]here's the profits and losses in 11.1, which is really tax profits and losses. And then 11.2 deals with the cash, whether it's from cash flow that's generated by the property or equity in the property that can be taken out through a sale or refinancing, and that's in 11.2.

Trial Tr. vol. 4, 881:21-883:6.

22. These expected benefits comport with the usual arrangement for LIHTC projects. Trial Tr. vol. 1, 56:14-24. No dispute exists that Farmhouse fully and satisfactorily has performed all duties, covenants, and restrictions under the LPA since 2002. (Doc. 170-8 at 200 (Dep. Jeffrey Sussman 260:15-25)); (Doc. 171-3 (Ex. 94.))

8

23. Sussman acknowledged at trial that MHTCP, as Limited Partner in the Bridger I Partnership, has received "every dime" to which the LPA entitled MHTCP. Trial Tr. vol. 3, 731:14-18, 732:2-13; (Doc. 171-4 (Ex. 100.)) This economic return resulted from the tax credits, operating losses, and cash flow accruing from the Bridger I Partnership.

24. Sussman, when questioned at trial, could identify nothing that MHTCP was entitled to receive under the LPA that it has not received.

> Q: And as of today, you can't identify anything that you were entitled to receive that you haven't received under the limited partnership agreement for Bridger I. Fair?
>
> A: Well, like I said, we're also entitled to, at some point -- it may -- not today, exactly, but the value of our equity in the partnership. So that hasn't been returned yet.
>
> Q: I'm talking about through today.
>
> A: Through today, correct.

Trial Tr. vol. 3, 732:2-9. The Court finds that MHTCP received all the payments to which it was entitled under the LPA.

**The Option under Section 8.1 of the Limited Partnership Agreement**

25. The LPA's Section 8.1 ("Section 8.1") incentivized the General Partner, Farmhouse, to run the property responsibly by way of an option (the "Option") to buy the Limited Partner's interest after a fifteen-year tax credit compliance period. Trial Tr. vol. 1, 148:12-24. The fifteen-year period relates to the

compliance period during which the project had to lease its units for below market rates to qualify for tax credits. (Doc. 172-3 at 38 (Ex. 4 at § 4.2)); Trial Tr. vol.1, 53:20-56:24, 66:19-67:12. The compliance period for the Bridger I Project ran for a period of fifteen years from 2003 to December 31, 2017. (Doc. 172-15 at 3 (Ex. 18)); Trial Tr. vol. 4, 866:1-16, 1003:17-20.

26. The purchase Option represents a valuable right held by the General Partner when contemplated in a LIHTC limited partnership agreement. Trial Tr. vol. 1, 148:8-24. The Option period for Farmhouse began from a date three years after the expiration of the compliance period on December 31, 2017. (Doc. 172-15 at 3 (Ex. 18.))

27. Farmhouse's Option remained available only for a six-month timeframe during the entirety of the Bridger I Partnership's term from September 5, 2002, through December 31, 2057. (Doc. 172-3 at 66 (Ex. 4 at § 8.1A)); Trial Tr. vol. 2, 317:14-25. The LPA provided that the Option period would last for a period of six months from January 1, 2021, to June 30, 2021. (Doc. 172-15 at 3 (Ex. 18.)) The LPA required Farmhouse to provide written notice of its exercise of the Option to MHTCP during the six-month Option period. (Doc. 172-3 at 66 (Ex. 4 at § 8.1B.))

28. Farmhouse timely notified MHTCP on January 26, 2021, within the six-month Option window, that it sought to exercise the Option to purchase

MHTCP's Limited Partner interest. (Doc. 157 at 4); (Doc. 172-15 (Ex. 18));
Trial Tr. vol. 3, 704:11-14. The LPA's Article VIII contains the Option, as
contemplated in the LPA language drafted by MHTCP's affiliate. (Doc. 157
at 3); (Doc. 172-3 at 66-67 (Ex. 4. at § 8.1))

29. The LPA prescribes the process to determine the purchase price of the
Limited Partner interest in the Bridger I Partnership. (Doc. 172-3 at 66 (Ex. 4
at § 8.1C.)) The LPA's plain language provides that MHTCP must deliver its
Limited Partner interest by assignment to the person designated by
Farmhouse. (Doc. 172-3 at 67 (Ex. 4 at § 8.1E.)) This delivery of the Option
must take place at closing on the Option after the parties have determined the
purchase price for the Limited Partner interest. *Id.*

30. No dispute exists that MHTCP timely received notice of Farmhouse's
exercise of the Option on January 26, 2021, during the six-month Option
period contemplated under the LPA. Trial Tr. vol. 3, 510:18-20, 704:7-14;
(Doc. 172-15 (Ex. 18.)) The dispute arises regarding whether Farmhouse
stood in default of its obligations under the LPA at the time of the notice based
on its assignment of its General Partner interest to Susan Burrows
("Burrows"). Farmhouse's written notice of its exercise of the Option to
MHTCP triggered the next step.

31. MHTCP never affirmatively consented to any assignment or transfer of the General Partner's interests in the Bridger I Partnership. *See, e.g.*, Trial Tr. vol. 2, 384:17-21.

**The Dabney-Burrows Property Settlement**

32. Dabney and Burrows married in 1976. Trial Tr. vol. 1, 47:9-13. Dabney and Burrows invested their assets heavily in real estate during their thirty-year marriage with a focus on the LIHTC industry. "The only major . . . marital asset that both Dabney and Susan Burrows had, [] were all real estate investments in various LIHTC limited partnership agreements." Trial Tr. vol. 4, 993:4-14.

33. Dabney and Burrows separated in 2009, and they filed for divorce in 2010. Trial Tr. vol. 1, 47:19-25, 182:15-23. Dabney and Burrows entered a property settlement agreement on September 13, 2013 ("2013 Divorce Agreement"). (Doc. 172-20 (Ex. 31.)) This first property settlement agreement represented the beginning of the dispute between Farmhouse and MHTCP.

34. The 2013 Divorce Agreement failed to resolve all issues related to the distribution of Dabney's and Burrows's marital assets. Trial Tr. vol. 1, 184:19-21. Dabney and Burrows "rushed" their 2013 Divorce Agreement and tried to "just split" Dabney's personal interests in his LIHTC projects. Trial Tr., vol. 4, 993:15-21; *see also* Trial Tr., vol. 1, 184:13-16.

12

35. For example, the 2013 Divorce Agreement included the division of Dabney's affordable housing projects. (Doc. 172-20 at 8-9 (Ex. 31.)) Dabney agreed "that Susan should share equally in any opportunity, interest[,] or right he has as a general partner, or by virtue of the relationship he has with these entities, to purchase LP interests in any of the limited partnerships," including Bridger I. (*Id.* at 10.) The 2013 Divorce Agreement also provided that Dabney, "in his individual capacity and as shareholder in The Dabney Company and The Dabney Company's capacity as the general partner of Farmhouse Partners, LP, guarantees that Susan shall have opportunity to participate equally with [Dabney] in purchasing the Limited Partner's interest in any and all of these affordable housing projects in which he is a general partner." (*Id.* at 10-11.)

36. This overly general language left Dabney and Burrows in an unworkable situation. Dabney testified at trial that Burrows did not trust him following entry of the 2013 Divorce Agreement, "[s]o she was constantly asking for [] the ability to look over [his] shoulder, to be present in the office with [Dabney], and in one case be the cosigner on all the checks of the properties," including Bridger I. Trial Tr., vol. 1, 183:22-184:4.

37. The process for distributing Dabney's affordable housing interests to Burrows under the terms of the 2013 Divorce Agreement became a "nightmare" for Dabney. Trial Tr., vol. 1, 184:5-12. The distribution made it

13

difficult for him to manage Farmhouse. Dabney admitted at trial that the first years of the divorce, including the attempted execution of the 2013 Divorce Agreement, were "acrimonious, very expensive, [and] very frustrating." Trial Tr., vol. 1, 183:3-7. This continued acrimony led Dabney and Burrows to execute a new Divorce Agreement on September 30, 2016 ("2016 Divorce Agreement"), after several more years of negotiation. Trial Tr. vol. 1, 184:22-185:2; (*see also* Doc. 172-1 at 1, 10-11 (Ex. 2.))

38. The 2016 Divorce Agreement clarifies the distribution of Dabney's affordable housing interests and focuses on those interests that Dabney and Burrows personally held. Trial Tr. vol. 4, 993:4-14. The "only major . . . marital asset[s]" in the Dabney-Burrows marital estate "were all real estate investments in various LIHTC limited partnerships." *Id.* The 2016 Divorce Agreement seeks to distribute these interests equitably between Dabney and Burrows. *Id.*

39. In this regard, the 2016 Divorce Agreement broadly contemplates Dabney's "transfer and/or assign[ment] to Burrows the Options and any other right or opportunity he . . . may have to purchase the limited partnership interests in Bridger I and Bridger II[.]" (Doc. 172-1 at 8 (Ex. 2.))

40. The 2016 Divorce Agreement specifically provided that "Dabney shall (i) transfer and/or assign to Burrows the Options and any other right or

opportunity he or any affiliated entity may have to purchase the limited partnership interests in Bridger I and Bridger II, and (ii) immediately request such third parties to consent to the transfer." (*Id.*) Bridger II was another of Farmhouse's low-income housing projects. (*Id.*)

41. Dabney testified regarding his understanding of the meaning of "any affiliated entity's right, title, and interest in Bridger I and II" to Burrows as set forth in the 2016 Divorce Agreement. Dabney explained that he understood that Farmhouse constituted an "affiliated entity" of his, and, therefore, he intended to transfer Farmhouse's options in Bridger I and II to Burrows. Dabney's testimony confirms this interpretation. Trial Tr. vol. 2, 374:24-375:17.

> Q: And it [section 3.a] states, 'Transfer and/or assign to Burrows the options and any other rights or opportunity he or any affiliated entity may have to purchase the limited partnership interests in Bridger I and Bridger II.' Do you see that?
>
> A: Yes.
>
> Q: Here, we're - it refers again to affiliated entity. Is it accurate to state when you signed this document you knew that meant and included Farmhouse?
>
> A: Yes. … Because Farmhouse held the option.
>
> Q: And Farmhouse was an affiliated entity of yours; correct?
>
> A: Yes.

Q: Pursuant to the 2016 settlement agreement, whatever value was attributable to the Bridger I option, that value was being transferred to Burrows, correct?

A: Correct.

Q: Was it your understanding when you signed the 2016 settlement agreement that whatever value existed in general partner's option rights for Bridger I that those, that value was transferred to Burrows?

A: Yes.

(Doc. 173-1 (Dep. William Dabney 216:11-20, 71:5-10, 71:15-72:1.))

42. Dabney also agreed that if the Limited Partners in Bridger I and II "do not consent to the transfer of the Options," the 2016 Divorce Agreement imposed a duty on him to "cooperate, in good faith, in negotiating a purchase of the Limited Partner interests in his name, upon terms and conditions proposed and approved by Burrows." (Doc. 172-1 at 8 (Ex. 2.)) Once Dabney obtained the Limited Partner interest, the 2016 Divorce Agreement required him to transfer them to Burrows. *Id.*

43. Dabney acknowledged that the 2016 Divorce Agreement imposed on him "no obligation to provide any funding, guarantees or indemnifications for such transaction." *Id.* The 2016 Divorce Agreement further directed that he "shall not interfere, in any way, with Burrows's attempts to exercise the Options and/or purchase the limited partner interests." *Id.*

16

44. Dabney further agreed that he would "use his best efforts and fully cooperate in Burrows['s] efforts to purchase the limited partner interests[.]" *Id.* Dabney's deposition transcript may be considered as evidence as he appeared as Farmhouse's designated Rule 30(b)(6) witness and as the only person who ever made decisions for, or acted on behalf of, Farmhouse. Dabney served as the managing agent of Farmhouse at the time of his 30(b)(6) deposition. Fed. R. Civ. P. 32(a)(3).

45. Dabney also agreed in the 2016 Divorce Agreement that he immediately would cause to be transferred to Burrows all his General Partnership interests if Burrows obtained the Limited Partner interests in Bridger I and II. (Doc. 172-1 at 10 (Ex. 2.)) Dabney admitted that he knew that MHTCP would not consent to the assignment or transfer of the Bridger options to Burrows at the time he signed the 2016 Divorce Agreement. Trial Tr. vol. 2, 377:9-12.

> Q: So at the time you signed this agreement, you fully understood that the limited partner was going to deny consent, correct?
>
> A: Yes.

*Id.*

46. Dabney understood when he signed the 2016 Divorce Agreement that he would be obligated to transfer both the limited partnership interest and Farmhouse's General Partner interest to Burrows, along with any other

interest or rights he had in Bridger I and II if Farmhouse were successful in acquiring the limited partnership interests in Bridger I and II. Trial Tr. vol. 2, 392:3-14. Dabney explained that he "wanted [Burrows] to come into ownership with or without partners of Bridger I and Bridger II, always," Trial Tr. vol. 2, 393:12-13. Dabney acknowledged that "[he] was obligating Farmhouse to transfer ownership of a property." Trial Tr. vol. 2, 442:16-17.

47. Dabney also understood at the time of signing the 2016 Divorce Agreement that the 2016 Divorce Agreement obligated him to transfer any interest he had acquired in Bridger I to Burrows. Burrows would have to pay the price for the Limited Partner interest. Trial Tr. vol. 2, 393:18-394:23.

48. Dabney conceded that this obligation applied whether Burrows purchased the interest in Bridger I through the Section 8.1 Option and the price set by an appraiser or by agreement between the parties. *Id.* Burrows would pay the amount set by the Section 8.1 Option process. Trial Tr. vol. 2, 394:24-395:10.

> Q: And whatever price is set under 8.1, if Farmhouse then acquires that interest, under the terms of this settlement agreement, as you understood it when you signed it, Burrows would have to pay that option price, and then you would be obligated to transfer the limited partner interest to her as well as Farmhouse's general partner interest?
>
> A: Yes.
>
> Q: If she wanted to, whether through financing or some other means, pay that option price set under 8.1, your

18

understanding when you signed the settlement agreement
is she had that right, and then you would be obligated to
transfer the limited partnership interest and general partner
interest in Bridger I and II to her; correct?

A: That's correct.

Trial Tr. vol. 2, 395:21- 396:2.

49. Dabney acknowledged that the exercise of Farmhouse's options under

Section 8.1 of the Bridger I and II partnership agreements represented the

most likely way that Burrows would come into ownership of Bridger I and II.

Trial Tr. vol. 2, 400:7-15.

**Farmhouse's Attempted Exercise of the Option**

50. Dabney wrote MHTCP in January 2017, as the 2016 Divorce Agreement

directed, seeking MHTCP's official consent to assign Farmhouse's General

Partner Option to Burrows. (Doc. 172-46 (Ex. 97)); Trial Tr. vol. 1, 189:5-6;

Trial Tr. vol. 2, 232:3-19. MHTCP refused consent to Farmhouse's requested

assignment of the Option in February 2017. (Doc. 172-47 (Ex. 98)); Trial Tr.

vol. 2, 237:12-18. Burrows's divorce attorney, John Amsden, responded in a

letter to MHTCP on April 20, 2017, that the Bridger I and II options had been

assigned to Burrows. (Doc. 172-16 (Ex. 20.))

51. MHTCP sent a notice of default to Farmhouse on July 10, 2018, alleging an

improper assignment from Dabney to Burrows. (Doc. 172-87 (Ex. 443.))

MHTCP declined to allow Farmhouse to exercise the Option and refused to

allow the Option process to proceed. MHTCP claimed that Farmhouse defaulted on the LPA based on Farmhouse's assignment of its General Partner rights and interests to a nonparty to the Bridger I Partnership. Trial Tr. vol. 3, 747:6-10; (*see, e.g.*, Doc. 172-3 at 50-51 (Ex. 4 at § 5.2.H.))

52. MHTCP took no steps to address Farmhouse's breach of the LPA, other than to decline consent to Farmhouse's assignment of its General Partner interest to Burrows, until Farmhouse filed this action. MHTCP took no action despite the LPA's provision of remedies, including removal of Farmhouse as General Partner and the return of management fees, in the event of a default. (Doc. 172-3 (Ex. 4)); (Doc. 103.) MHTCP continued to work with Farmhouse as its General Partner in the Bridger I Partnership from 2018 until the time that Farmhouse filed this action in 2021. (Doc. 103.)

53. The Court previously denied as untimely MHTCP's motion to amend to add counterclaims against Farmhouse. (*Id.*)

54. Nearly three years later, on January 26, 2021, Farmhouse sent MHTCP a timely notice of exercise of the Option. (Doc. 172-15 (Ex. 18.)) Farmhouse sought to purchase MHTCP's interest in the Bridger I partnership pursuant to the terms of Section 8.1 of the LPA. (*Id.*) Farmhouse's notice of exercise set forth an Option price for MHTCP's interest of $535,000. *Id.*

55. Farmhouse based its Option price on an appraisal report by Keith O'Reilly and a memorandum by Stephen Strain, an attorney in Sacramento, California. *Id.* Farmhouse played no role in the selection or engagement of O'Reilly or Strain, or in the development of their valuation methodology. Trial Tr. vol. 3, 509:24-510:9, 526:3-527:6, 566:23-567:18.

56. Dabney admitted that he had never used the methodology stated in Farmhouse's notice of exercise to purchase the Limited Partner's interest in the Bridger I Project. Trial Tr. vol. 3, 513:25-514:20; Trial Tr. vol. 3, 565:16-18.

> Q: Have you ever used the methodology stated herein [in Strain's January 4, 2021 memorandum attached to the notice of exercise] for any purpose anywhere in your life other than this litigation?

> A: No.

*Id.*

57. Farmhouse sought to exercise the Bridger I Option, in part, based on Dabney's fear of potential litigation by Burrows arising from their 2016 Divorce Agreement. Trial Tr. vol. 3, 557:11-15.

> Q: So if you hadn't exercised the option for Bridger I on behalf of Farmhouse, you believe you may well have been sued for breach of the marital settlement agreement by Burrows; correct?

> A: That's what I thought, yeah.

21

Trial Tr. vol. 3, 566:11-14.

> Q: You felt under the marital settlement agreement
> that you were obligated to send this notice of exercise;
> correct?
>
> A: Well, yes.

Trial Tr. vol. 3, 596:16-17.

When asked if obligations under the 2016 Divorce Agreement were a reason

for filing the lawsuit, Dabney answered:

> They were a reason, yes.

(Doc. 172-120 (Ex. 501.))

Dabney admitted this obligation to Sussman, MHTCP's corporate designee:

> I told him the marital settlement agreement included
> obligations to my ex-wife, I had an obligation to help her
> come into ownership of Bridger I and Bridger II, and if
> Farmhouse did not exercise the option that my ex-wife
> might come after me.

*Id.*

58. MHTCP's counsel sent a letter in response to Farmhouse's January 2021

notice of exercise of the Option. Sussman, acting as MHTCP's counsel,

informed Farmhouse that it was in default of the LPA, that Farmhouse could

not exercise the Option, and that Farmhouse had failed to comply with Section

8.1 of the LPA. (Doc. 172-108 (Ex. 474.)) MHTCP claimed that Farmhouse's

proposed Option price fell more than $1 million short of the fair market value of MHTCP's interest. (172-108 (Ex. 474 at 2 & n.1.))

59. Sussman testified that the value of MHTCP's interest was approximately $4 million. This amount far exceeded the $535,000 Option price that Farmhouse proposed in its notice of exercise. Trial Tr. vol. 3, 730:22-731:9. Sussman explained that the value of Bridger I property actually exceeded $6 million based on the recent sale of the Baxter property. *Id.* The Baxter sale, also in Bozeman, closed in September 2021 and was a comparable property to the Bridger I property. *Id.*

60. Sussman used the project value and the method that Farmhouse and MHTCP's affiliates had used previously for their other projects in assessing the value of MHTCP's Limited Partner interest in the Bridger I project. *Id.* The parties had agreed for those other projects that the Limited Partner would receive amounts based on a sale of the project. *Id.*; Trial Tr. vol. 2, 355:16-25. This methodology would give the Limited Partner its share of the equity in a project above and beyond the economic benefits accruing to the Limited Partner, including tax credits and tax losses. *Id.* The parties identified the value of the specific property, subtracted debt that was owed, and flowed the remaining amount using the "waterfall" provision of the partnership agreement. Trial Tr. vol. 2, 298:1-10. The "waterfall" provision dictated how

proceeds from the sale of the project would be distributed to the partners. *Id.* Application of fhis methodology would result in a value of MHTCP's interest in Bridger I of around $4 million. Trial Tr. vol. 3, 730:22-731:9; Trial Tr. vol. 2, 452:24-453:6

## CONCLUSIONS OF LAW

1. The Court possesses jurisdiction over the subject matter and parties pursuant to 28 U.S.C. § 1332(a)(2).

2. Venue is proper in the Butte division pursuant to 28 U.S.C. § 1391(b)(2), as the property in question sits in Gallatin County and Gallatin County falls within the Butte Division of the District of Montana.

3. Montana law governs the interpretation of the LPA. (Doc. 172-3 (Ex. 4.))

4. Farmhouse asserts two causes of action: 1) for specific performance to enforce the Option in the LPA; and 2) declaratory relief that Farmhouse is entitled to exercise the Option.

5. "In the construction of an instrument, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted. Where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all." *See* Mont. Code Ann. § 1-4-101; *see also*

*Ohio Farmers Inc. Co. v. JEM Contracting, Inc.*, 386 P.3d 613, 616 (Mont. 2016).

6. General Partners owe fiduciary duties to Limited Partners and partnerships. These obligations as expressed under Montana law require a General Partner to "exercise any rights consistently with the obligation of good faith and fair dealing." *See* Mont. Code Ann. § 35-12-811; *Wilson v. Wilson*, 210 P. 896, 899 (Mont. 1922); *Jackpot Farms, Inc. v. Johns Farms, Inc.*, 477 P.3d 320, 324 (Mont. 2020).

**Farmhouse Breached the LPA**

7. The Option provision states that "the General Partner shall have an option (the 'Option') to purchase the Limited Partner's Interest in the Partnership on the following terms and conditions" if the General Partner or any Affiliate thereof does not stand in "default under the terms of this Agreement or any Related Agreement." (Doc. 172-3 at 66-67 (Ex. 4 at §8.1.))

8. The LPA prohibits Farmhouse from assigning or transferring any interests, rights, or benefits in or from the Bridger I Option without MHTCP's prior written consent. (Doc. 172-3 (Ex. 4 at §§ 7.3E, 7.3G, 5.2H, 12.1B.)) The LPA also prohibits Farmhouse from transferring control to any third party and from entering into any agreement or take any action without the prior written

consent of MHTCP with respect to any matters for which its prior written consent is required. (Doc. 172-3 at 61 (Ex. 4 at §§ 7.3Q.))

9. Farmhouse has breached the LPA. Farmhouse remains a party to the LPA. Farmhouse assigned interests, rights, and benefits in the Bridger I and II options to Burrows, however, without MHTCP's prior written consent. Farmhouse transferred control to others, specifically Burrows, with respect to the exercise of the Bridger I Option and interests, rights, and benefits in the Bridger I and II projects. Farmhouse entered into an agreement to assign and took actions to assign interests, rights, and benefits to Burrows, as a third party, and agreed to transfer control of Farmhouse without MHTCP's prior written consent.

10. The evidence showing Farmhouse's assignment of interests to Burrows begins with the failure of the 2013 Divorce Agreement. The overly general language of the first agreement proved unworkable as acknowledged by Dabney. Trial Tr., vol. 1, 183:22-184:4. The need to execute the 2016 Divorce Agreement itself and the more explicit language contained in the 2016 Divorce Agreement regarding Dabney's obligations supports this conclusion.

11. Dabney agreed to "transfer and/or assign to Burrows the Options and any other right or opportunity he or any affiliated entity may have to purchase the limited partnership interests in Bridger I and Bridger II." (Doc. 172-1 at 8 (Ex.

2 at 8.)) Dabney testified at trial that he understood the term "affiliated entity" to include Farmhouse. Trial Tr. vol. 2, 374:24-375:17. Dabney conceded that he was assigning Farmhouse's interests in Bridger I and II to Burrows. *Id.*

12. Evidence at trial demonstrated that the 2016 Divorce Agreement transferred rights under the LPA from Farmhouse to Burrows without MHTCP's consent. The testimony of Dabney and Stephan Garden (who negotiated the 2016 Divorce Agreement for Burrows) confirmed that the purpose and intent of the 2016 Divorce Agreement, with respect to the Bridger I and II projects, was for Farmhouse to transfer all its interests and benefits in the Bridger options to Burrows. Trial Tr. vol. 4, 1002:2-25; 1005:19-1006:12.

13. Burrows would exercise the Bridger I Option if MHTCP agreed to the assignment of Farmhouse's Option to her. Burrows effectively would exercise the Option anyway if MHTCP did not consent to Farmhouse's request. In the absence of MTHCP's consent, Farmhouse would exercise the Option for Burrows's benefit. (Doc. 170-8 at 60 (Dep. Jeffrey Sussman 81:14-25, 82:1-18.))

> Q: Did [Dabney] ever tell you that Farmhouse Partners was exercising the option after January 1st of 2021 for the benefit of Susan Burrows?
>
> A: He has told me that Farmhouse and he have no . . . interest in the option either way. . . . [H]e was exercising the option on her behalf and had filed a lawsuit in its name

> on her behalf, because it was just an easier way to deal with it.

*Id.*

14. Dabney retained no financial or other interest in the Option after the 2016 Divorce Agreement had been signed. Trial Tr. vol. 2, 392:3-393:13, 442:16-17. Dabney retained no control over the exercise or the process. Burrows and her advisors instead would dictate and control the terms of the Option exercise. Trial Tr. vol. 4, 1060. Burrows would participate in and pay the price set by the Section 8.1 appraisal process if it occurred. *Id.* Burrows ultimately would acquire the Limited Partner interest from MHTCP and the General Partner interest from Dabney, and ultimately the Bridger I Project. *Id.* This ownership would entitle Burrows to sell the Bridger I Project to a third party. (Doc. 159 at 45 (Dep. Susan Burrows 44:11-45:18.))

15. Dabney also admitted at trial that he would not have exercised the Option on behalf of Farmhouse, or filed this litigation, if he had not been concerned that Burrows would sue him based on his obligations under the 2016 Divorce Agreement. Trial Tr. vol. 3, 557:11-15.

> Q: So if you hadn't exercised the option for Bridger I on behalf of Farmhouse, you believe you may well have been sued for breach of the marital settlement agreement by Burrows; correct?

> A: That's what I thought, yeah.

Trial Tr. vol. 3, 566:11-14.

> Q: You felt under the marital settlement agreement that you were obligated to send this notice of exercise; correct?
>
> A: Well, yes.

Trial Tr. vol. 3, 596:16-17.

When asked if obligations under the 2016 Divorce Agreement were "a reason for filing the lawsuit," Dabney answered:

> They were a reason, yes.

*Id.*

16. Farmhouse's attempt to evade the LPA's consent requirements violated its obligations to its partner, MHTCP, by assigning interests and transferring control over the Option to Burrows without MHTCP's consent. (*See* Doc. 172-3 (Ex. 4 at §§ 7.3E, 7.3G, 5.2H, 12.1B, 7.1, 7.3Q.))

17. The Court concludes that Farmhouse has been in default of the LPA since Dabney entered the 2016 Divorce Agreement.

**Whether the Unauthorized Transfer Materially Breached the LPA**

18. The question arises whether Farmhouse materially breached the LPA through its unauthorized assignment of the General Partner interest in the Bridger I Project to Burrows. The Montana Supreme Court distinguishes between "material" breaches and "incidental" breaches in determining remedies for

breach of contract. A "material" breach entitles the non-breaching party to terminate the contract. *R.C. Hobbs Enterps. v. J.G.L. Distributing*, 104 P.3d 503, 508 (Mont. 2004). An "incidental" breach, by contrast, only entitles the non-breaching party to sue for damages. *Id.*

19. The Montana Supreme Court's analysis in *R.C. Hobbs Enterprises* addresses "remedies for breach of contract." *Id.* These remedies determine whether the injured party may sue to rescind a contract if the breach constituted a material breach or whether the injured party only can sue to recover damages if a breach is not material. *Id.*

20. The Montana Supreme Court recognizes that a "material breach" usually "touches the fundamental purpose of the contract and defeats the object of the parties in making the contract." *Id.* The Restatement (Second) of Contracts identifies five significant circumstances which may determine whether a failure to render performance proves material. *See Norwood v. Service Distrib., Inc.*, 994 P.2d 25, 31 (Mont. 2000) (citing Restatement (Second) of Contracts, § 241); *see also First Interstate Bank of Idaho v. Small Business Admin.*, 868 F.2d 340, 344 n.4 (9th Cir. 1989) (listing Restatement factors on materiality).

21. A court must consider the following circumstances in evaluating the nature of the breach: 1) the extent to which the injured party will be deprived of the

benefit which it reasonably expected; 2) the extent to which it can receive

adequate compensation for the part of that benefit of which it will be deprived;

3) the extent to which the nonperforming party will suffer forfeiture; 4) the

likelihood that the nonperforming party will cure its failure; and 5) the extent

to which the behavior of the nonperforming party comports with standards of

good faith and fair dealing. Restatement (Second) of Contracts, § 241.

22. The Montana Supreme Court further has explained that "the breach must be

significant enough to amount to the nonoccurrence of a constructive condition

of exchange" to justify the injured party's suspending performance. *Flaig v.

Gramm*, 983 P.2d 396, 401 (Mont. 1999) (citation omitted).

23. *Davidson v. Barstad*, 435 P.3d 640 (Mont. 2019), for example, declined to

relieve a seller of real property of its obligation to perform despite the

purchasers' alleged breach of contract. The seller retained an auction company

to sell two parcels of real property at auction. *Id.* at 642. The auction company

vetted prospective bidders by requiring that each auction registrant tender

certified funds sufficient to cover a preset bid deposit amount. *Id.* The auction

company also required successful bidders to provide a ten percent down

payment by company or personal check. *Id.* at 642-43.

24. One purchaser presented a personal check and a letter from their bank

verifying the funds in the account. *Id.* The second purchaser presented cash.

31

*Id.* The auction company accepted both applications and issued bidding documents to the prospective purchasers. *Id.* at 643. Each purchaser proved to be the high bidder on a parcel, and each executed a buy/sell agreement for their parcel after the auction. *Id.* One purchaser tendered cash to cover the down payment, and the other purchaser tendered a personal check. *Id.* The executed buy/sell agreements contained no mention of the form of payment requirements. *Id.* The auction company accepted both payments. *Id.*

25. The seller refused to perform under the buy/sell agreements. The seller alleged that the first purchaser's bid deposit did not comply with the "certified funds" requirement. *Id.* at 644. The sellers similarly asserted that the second purchaser's cash down payment did not comply with the "company or personal check requirement." *Id.* The Montana Supreme Court rejected the seller's nonperformance. Any alleged breach by the purchasers proved "immaterial" under the circumstances. *Id.* at 648-49.

26. *R.C. Hobbs Enterprises* analyzed specifically whether assignment of a purchase option constituted a material breach of a contract to purchase land. *R.C. Hobbs Enterps. v. J.G.L. Distributing*, 104 P.3d 503, 508 (Mont. 2004). The purchaser agreed to make monthly payments to a landowner in exchange for temporary possession of the land and the option to purchase. *Id.* at 505. The contract provided that the purchaser could not assign its interest in the

purchase option without the landowner's consent. *Id.* The purchaser nevertheless assigned its option right to R.C. Hobbs, the assignee, without having obtained the consent of the landowner. *Id.* at 506.

27. The assignee began making the required monthly payments to the landowner through an escrow account. *Id.* The landowner, unaware of the assignment, accepted these payments from the assignee for approximately two years until the assignee inadvertently missed a single monthly payment. *Id.* The landowner informed the purchaser that it had forfeited its option rights due to this missed payment. *Id.* Only after sending this notice did the landowner learn of the purchaser's assignment. *Id.*

28. The landowner refused to honor the purchase option when the assignee attempted to exercise the option. *Id.* The original purchaser then attempted to exercise the option, but the landowner refused, again citing the purchaser's improper assignment. *Id.* The Montana Supreme Court voided the attempted assignment because the purchaser lacked consent from the landowner to make the assignment. *Id.* at 508.

29. The Montana Supreme Court determined, however, that no material breach of contract had occurred. The original purchaser retained its right to assert its purchase option. *Id.* The purchaser's assignment had not defeated the purpose of the contract. *Id.* at 508-09. The landowner admitted to learning of the

assignment only after a single missed payment. *Id.* at 506.  The landowner had

accepted the required payments from the assignee for nearly two years after

the assignment. *Id.* The landowner achieved "every purpose [they] had in

entering the Option" because they received every monthly payment due under

the option contract. *Id.* at 509. The landowner had suffered no damage from

the assignment. *Id.*

30. Similar to the analysis of the Montana Supreme Court in *Davidson* and *R.C.*

*Hobbs Enterprises*, the Court concludes as a matter of law that Farmhouse's

breach of the LPA proves immaterial and fails to justify MHTCP's

nonperformance of the Option. Nothing in the record suggests that Dabney's

breach of the LPA when he entered the 2016 Divorce Agreement (or the 2013

Divorce Agreement, for that matter) touched the fundamental object of the

parties in entering the LPA.

31. The LPA contract constituted the mechanism by which MHTCP sought to

achieve its economic objectives and its anticipated return on the LIHTC

project investment. Trial Tr. vol. 3, 686:14-687:12.

32. The terms of the LPA demonstrate that MHTCP negotiated to obtain tax

credits, asset management fees, and distribution of profits generated by the

Bridger I Project. Trial Tr. vol. 3, 731:14; (*see also* Doc. 172-3 (Ex. 4 at §§

6.2, 11.1A, 11.1C, 11.2A(10), 11.3H)); (Doc. 171-4 (Ex. 100.)) MHTCP

specifically bargained to receive 99.99% of the tax credits and losses, as well as the profits distributed from cash flow, that the Bridger I Project produced. (Doc. 172-3 at 70-76 (Ex. 4 at §§ 11.1A, 11.1C, 11.2A(10), 11.3H.))

33. Farmhouse fully and satisfactorily has performed all duties, covenants, and restrictions under the LPA since 2002 beyond the improper assignment of Farmhouse's General Partner interest in the Bridger I Partnership. (Doc. 170-8 at 200 (Dep. Jeffrey Sussman 260:15-25)); (Doc. 171-3 (Ex. 94.))

34. The following facts lead the Court to reach this conclusion. MHTCP received all the payments owed to it under the LPA. MHTCP's corporate designee Sussman has acknowledged that MHTCP received "every dime" to which the LPA entitled MHTCP as the project's Limited Partner. Trial Tr. vol. 3, 731:14-18, 732:2-13; (Doc. 171-4 (Ex. 100.)) Sussman, at trial, could not identify anything the LPA entitled MHTCP to receive that the entity had not received. *Id.*

35. Sussman further admitted that Farmhouse satisfactorily performed all its obligations as General Partner in the Bridger I Partnership apart from Dabney divorcing Burrows on the terms spelled out in the 2016 Divorce Agreement. Sussman, when testifying at trial, could identify "no other complaints" with Farmhouse's performance and conduct as the General Partner. (Doc. 170-8 at

200 (Dep. Jeffrey Sussman 260:15-25)); (Doc. 171-3 (Ex. 94)); Trial Tr. vol. 3, 709:22-710:4.

36. MHTCP has pointed to no provision in the LPA that would indicate that nonparty efforts to negotiate to purchase the Limited Partner interest from MHTCP touches the "fundamental object" of the parties in making the LPA. *Id.*

37. As the Court explained at the close of trial evidence, whether Dabney, Burrows, or anybody else now becomes the Limited Partner in the Bridger I Partnership, nothing in the record suggests such a "substitution" defeats the object of the parties in executing the LPA in 2002. Trial Tr., vol. 4, 1077:10-21. The contract's purpose already has been achieved: "to develop low-income housing, [and] suck the benefits out of it through the tax credits, through the losses we get to take on our taxes." Trial Tr., vol. 4, 1077:16-21. MHTCP now must negotiate any option to purchase under Section 8.1 of the LPA with Burrows rather than Dabney.

38. The Court declares that Farmhouse was not in material breach of the LPA at the time of providing notice to execute the Option, and, therefore, declines to excuse MHTCP's nonperformance under Section 8.1. *R.C. Hobbs Enterps. v. J.G.L. Distributing*, 104 P.3d 503, 508 (Mont. 2004). Farmhouse timely

36

notified MHTCP of its intent to exercise its right under Section 8.1 of the LPA to purchase MHTCP's Limited Partner interest in the Bridger I Project.

**Whether Specific Performance Applies**

39. Farmhouse seeks specific performance of the Option pursuant to the terms set forth in Section 8.1 of the LPA as a remedy for MHTC's failure to perform. A claim for specific performance presents an appeal to the conscience of the court, and generally, in such a proceeding, "the inquiry must be whether, in equity and good conscience, the court should specifically enforce the contract." *Seifert v. Seifert*, 568 P.2d 155, 157 (Mont. 1977). A court should grant specific performance "when it is apparent from a view of all of the circumstances of a particular case that it will serve the ends of justice, and it will be withheld when, from a like view, it appears that it will produce hardships or injustice to either party." *Id*. The Court must "examine the facts and circumstances of this case to determine whether plaintiff fully and fairly performed his obligations under the contract." *Id.*

40. The Montana Legislature has defined the availability of specific performance. Montana law recognizes that "[n]either party to an obligation can be compelled specifically to perform it unless the other party thereto has performed or is compellable specifically to perform everything to which the former is entitled under the same obligation, either completely or nearly so,

37

together with full compensation for any want of entire performance." Mont. Code Ann. § 27-1-414.

41. Specific performance becomes available under the following circumstances: 1) the act to be done is in the performance of an express trust; 2) the act to be done is such that pecuniary compensation for its nonperformance would not afford adequate relief; 3) it would be extremely difficult to ascertain the actual damages caused by nonperformance; or 4) specific performance was specifically agreed to in writing. *McDonald v. Cosman*, 6 P.3d 956, 958 (Mont. 2000) (citing Mont. Code Ann. §§ 27-1-411, 27-1-419). A court should grant specific performance "when it is apparent from a view of all the circumstances of the particular case that it will serve the ends of justice[.]" *Double AA Corp. v. Newland & Co.*, 905 P.2d 138, 141 (Mont. 1995) (quoting *Seifert*, 568 P.2d at 156).

42. A review of the Montana statutes, Montana case law, and the Court's own experience with Montana contract law leads it to conclude that Farmhouse should be entitled to specific performance of its exercise of the Option in Section 8.1 of the LPA.

43. The Court first determines that the terms of the LPA regarding the Option in Section 8.1 are sufficiently clear. "Absolute certainty," however, "in every detail is not a prerequisite for specific performance." *McDonald*, 6 P.3d at 959

(quoting *Keaster v. Bozik*, 623 P.2d 1376, 1380 (Mont. 1981)). *McDonald* presented a dispute between parties engaged in a long-time business venture in real property. *Id.* at 958. The lessee signed a contract in 1977 to lease commercial property from the lessor for a period of twenty-five years. *Id.* at 957. The contract provided that the lessee could exercise an option to purchase the real property only after February 1, 1998, and that the option period would expire sixty days after that date. *Id.*

44. The contract directed the lessee to give the lessor written notice of its intent to exercise the option. Upon issuance of this written notice, the contract directed the parties to establish the lessee's purchase price of the land by using three appraisers: one selected by each party and the third selected by the other two appraisers. *Id.* The lessee would pay one-fourth of the purchase price within sixty days after the appraisers agreed on a price. *Id.* The contract also directed the lessee to pay the remaining balance in equal yearly installments for a period of ten years. *Id.* The lessor refused to allow the lessee to exercise the option. The lessor then opposed specific performance after a district court determined the option contract legally enforceable. *Id.* at 958. The contract, in the lessor's view, omitted agreement on key terms and proved too vague to specifically enforce. *Id.* at 958-59.

45. The Montana Supreme Court disagreed. It determined that the option "set[]
forth the time in which the option is exercisable, the method for calculating
the purchase price and the interest rate, the method by which the purchase
price shall be paid, and the parties' rights on default." *Id.* at 958.  The option
contained all the material terms "to make the acts which must be done to
purchase the property clearly ascertainable." *Id.*

46. The LPA, as written and signed by the parties, likewise contains no
ambiguities and supports specific enforcement. The Option in Section 8.1 of
the LPA provides the process by which Farmhouse may exercise its right to
purchase the Limited Partner interest held by MHTCP. Neither party operated
under misapprehension about the need to enter the LPA or the consequences
of becoming bound by it. *Cf. Double AA Corp. v. Newland & Co*., 905 P.2d
138, 141 (Mont. 1995). Similar to the long-term lessee in *McDonald*, the
parties here have operated under the LPA throughout, and three years past,
the fifteen-year compliance period. Farmhouse timely has filed written notice
of its intent to exercise the Option as set forth in Section 8.1. The contract here
represents an agreement "sufficiently definite and complete with regard to the
subject matter to allow specific performance." *Keaster v. Bozik*, 623 P.2d
1376, 1381 (Mont. 1981). The Court determines, in any event, that the
language of Section 8.1 sufficiently articulates the Option purchase process.

Section 8.1 should govern the exercise of Farmhouse's Option rights given that Farmhouse has fulfilled its obligations under the LPA.

47. *Maxted v. Barrett*, 643 P.2d 1161 (Mont. 1982), in which the Montana Supreme Court affirmed specific performance of a buy-sell agreement for the purchase of a mortgage interest in an apartment building, provides further support for this Court's conclusion that it should compel specific performance. *Maxted*, 643 P.2d at 1163. The mortgagee had refused to sell its interest in the apartment building despite having received the agreed upon purchase amount from the purchaser. *Id* at 1164. Specific performance constituted the appropriate relief where the mortgagee had received everything to which it was entitled under the agreement. *Id.* at 1165. The mortgagee "could be compelled . . . to specifically perform [its] part of the obligation." *Id.* at 1165.

48. *Myhre v. Myhre*, 554 P.2d 276 (Mont. 1976), addressed specific performance of a contract for the sale of company shares of a family-owned business. A son could enforce specific performance of an option agreement to transfer shares of the family company from his mother. *Myhre*, 554 P.2d at 280-81. The son satisfactorily had met all the conditions of the option agreement: the son's annual payments of the purchase price; the son's written notice of acceptance of the offer to purchase the shares; and the son's tender of a

specified down payment within a set time. *Id.* at 281. The Montana Supreme Court explained that the son, as the party seeking specific performance, had performed fully his obligations under the contract. *Id.*

49. *Myhre* also recognized that the awarding of damages would not have been appropriate given that the stock in the privately traded family company had no market value. *Id.* Any attempted valuation "would not have been ascertainable without the wildest speculation." *Id.* More importantly, the Montana Supreme Court recognized that the son's acquisition of the stock would give him operating control of the company. *Id.* The existence of these intangible factors demonstrated that "it would seem to have been an abuse of discretion on the part of the court to fail to decree specific performance." *Id.*

50. Specific performance likewise proves the appropriate remedy here. Farmhouse timely provided written notice of its election to exercise the Option to purchase MHTCP's Limited Partner interest in the Bridger I Project. (Doc. 172-15 (Ex. 18.)) Farmhouse was not in material breach when it provided notice. Pecuniary compensation for nonperformance of the Option would not afford adequate relief for MHTCP's breach. It would be difficult for the Court to ascertain the actual damages that MHTCP's nonperformance has caused. *See Myhre*, 554 P.2d at 281. Farmhouse's exercise of the Option

in Section 8.1, as with the son's option exercise in *Myhre*, will give it control over the Bridger I Partnership.

51. A review of all the circumstances of this case confirms that specific performance of Farmhouse's Option right will serve the ends of justice. *Double AA Corp. v. Newland & Co*., 905 P.2d 138, 141 (Mont. 1995). *Double AA Corp.*, represents one of the few cases in which the Montana Supreme Court has denied specific performance as a remedy for the breach of a contract to purchase real property. Specific performance in *Double AA Corp.*, proved inappropriate due to the unfairness to one party to the contract. The seller of a ranch, a family trust, had operated under the mistaken assumption that sizable tax consequences would accrue to the trust absent an imminent sale of the ranch. *Id*. An outside investment advisor with connections to the purchaser had provided this erroneous advice. *Id.* The exercise of specific performance under such circumstances "would impose a greater hardship on the seller than denial would impose on the buyer." *Id.*

52. The exercise of specific performance of the LPA would impose no unique hardships on either party as both parties entered the LPA fully informed of what to expect in this LIHTC project. MHTCP expected Farmhouse to manage the property appropriately during the compliance period. Farmhouse complied. Farmhouse expected MHTCP to provide the money necessary to

develop and operate the property. MHTCP complied. The only potential hardship derives from the method for dividing the windfall that has accrued from the rising real estate market in Bozeman, Montana. MHTCP still will have an opportunity, however, to negotiate the terms of Section 8.1 of the LPA with Burrows in control of Farmhouse rather than Dabney. This outcome does not suggest that the hardships identified in *Double AA, Corp.* would befall MHTCP if required to perform under the terms of the LPA.

53. The Court recognizes that Farmhouse has provided notice of its intent to exercise the Option to purchase the General Partner interest from MHTCP, but it has not yet paid for the General Partner interest. The parties still must follow the procedures set forth in Section 8.1 of the LPA. The Montana Supreme Court's decision in *Boyne USA, Inc. v. Spanish Peaks Dev., LLC*, 292 P.3d 432 (Mont. 2013), provides guidance and highlights the correctness of awarding specific performance here.

54. A ski resort brought claims for breach of contract and specific performance against a private luxury club and the club's assignee. *Id.* at 439. The ski resort had entered a contract to purchase the top of Lone Peak in exchange for cash, the transfer of a parcel of real property, and providing ski in/ski out access to residents of the club through the construction of a new chairlift to serve the club's residents. *Id.* at 438. The club, operating through a "dizzying array" of

limited liability companies and partnerships, refused to convey title to the top of Lone Peak after construction of the chairlift. The club claimed that the ski resort had not provided the chairlift in a timely manner and had transferred certain real property to the wrong party. *Id.* at 436, 438. The club also claimed that the ski resort had not yet provided its payment for the property. *Id.*

55. The ski resort countered that it had not yet provided payment due to the luxury club's anticipatory repudiation of its contractual duty to transfer the Lone Peak property to the ski resort. *Id.* The Montana Supreme Court determined that the ski resort could bring its action for specific performance of the Lone Peak transfer agreement even though ski resort had not yet fulfilled its last contractual obligation to pay the club for the Lone Peak property. *Id.* The law does not require a party to an agreement to perform a useless act: "If a party to a contract repudiates his contractual duty prior to his obligation to perform, the other party may enforce the obligation without performing or offering to perform any of her obligations." *Id.* (citing *Eschenbacher v. Anderson*, 34 P.3d 87, 93 (Mont. 2001)). The Montana Supreme Court would not require the ski resort "first to perform the useless act" of paying the club when the club already anticipatorily had breached the agreement for the transfer of the top of Lone Peak. *Id.* at 443-44.

56. The Montana Supreme Court in *Boyne* reasoned that specific performance proved appropriate where the pecuniary compensation for the club's failure to perform pursuant to the terms of a contract would fail to afford adequate relief to the ski resort. *Id.* (citing Mont. Code Ann. § 27-1-411(2)).

57. Montana law directs a court to presume "that the breach of the contract cannot be relieved adequately by pecuniary compensation for contracts that involve the sale of land." *Id.* at 444 (citing Mont. Code Ann. § 27-1-419). This presumption applies to Farmhouse's exercise of the Option in Section 8.1 of the LPA.

58. Any alleged lack of a price term specified in a contract does not defeat this component of specific performance relief. The contract in *Boyne* required the ski resort to pay the luxury club for half of the value of the Lone Peak property. The contract directed the ski resort to pay "the appraised value of the [Lone Peak] Property in the Swap" of land between the United States and an entity related to the luxury club. *Id.* at 444. The contract between the ski resort and the club estimated the cost at approximately $800 per acre. *Id.* Neither party questioned this amount at trial and the Montana Supreme Court deemed it sufficiently specific. *Id.* The Court here will not question Section 8.1's lack of a specified purchase price as part of the evaluation whether compensation for MHTCP's nonperformance would fail to afford adequate relief.

59. Farmhouse has performed its duties under the LPA since 2002, the start of MHTCP and Farmhouse's partnership in the Bridger I Project. (Doc. 170-8 at 200 (Dep. Jeffrey Sussman 260:15-25)); (Doc. 171-3 (Ex. 94.)) The LPA demonstrates that MHTCP expected to receive tax credits and losses, asset management fees, and distribution of profits from the Bridger I Project. Trial Tr. vol. 3, 731:14; (*see also* Doc. 172-3 (Ex. 4 at §§ 6.2, 11.1A, 11.1C, 11.2A(10), 11.3H)); (Doc. 171-4 (Ex. 100.)) MHTCP has received those expected benefits. *See* Trial Tr. vol. 3, 732:2-9. MHTCP has failed to identify any benefit owed it under the LPA that the entity has not received. *See, e.g.*, Trial Tr. vol. 3, 731:14-18, 732:2-13; (Doc. 171-4 (Ex. 100.))

60. Farmhouse and MHTCP operated an arms-length business relationship similar to the seller/purchaser in *Maxtad*. *Maxted v. Barrett*, 643 P.2d 1161, 1163 (Mont. 1982). The seller there received all the benefits to which the contract entitled him, just as MHTCP has received its benefits here. It made little difference to *Maxtad*'s seller who paid him the contract amount. *Id.* at 1163. Sussman and Dabney have testified regarding their numerous fishing outings on rivers in Montana. (*See, e.g.*, Doc 172-120 at 3 (Ex. 501.)) Dabney testified that they discussed his acrimonious divorce from Burrows on these outings. *Id.* Despite any personal relationship between the two anglers, MHTCP sent Sussman on regular trips to Montana to oversee its investments

in LIHTC projects there rather than to develop a friendship with the actual person behind their General Partner in the Bridger I Partnership. As in *Maxted*, it made little difference to MHTCP who occupied the partner's seat so long as MHTCP received its valuable tax credits and other contractual benefits under the LIHTC system.

61. The compliance period for the Bridger I Partnership has expired. Farmhouse timely has exercised its Option to purchase the interest of its Limited Partner MHTCP. MHTCP now will have to deal with the reconstituted Farmhouse, with Burrows as the General Partner, for the sole remaining purpose of negotiating Farmhouse's exercise of the Option pursuant to the terms of Section 8.1 of the LPA.

62. This Court previously rejected MHTCP's request for leave to file counterclaims in this matter. (Doc. 103.) The Court rejected MHTCP's request, in part, because MTHCP had failed to exercise diligence in raising any counterclaims related to Farmhouse's default under the LPA. (*Id.* at 4.) "The record before the Court [was] clear: MTHCP consistently has asserted that Farmhouse [was] in default of the [LPA]. MHTCP was aware of the divorce settlement agreement between [Dabney] and [Burrows] by February 7, 2017. MHTCP sent a notice of default to Farmhouse, alleging an improper assignment . . . on July 10, 2018. MHTCP again stated that Farmhouse was in

default on February 10, 2021, following Farmhouse's attempt to exercise the purchase option." (*Id.*)

63. This Court also explained that MTCHP had known of the remedies that the LPA provided, including removal of Farmhouse as General Partner and the return from Farmhouse to MTCHP of any management fees paid while Farmhouse was in default. (*Id.*) The Court determined that MTCHP had known of these remedies for over three years—years during which MTCHP continued to operate with Farmhouse as its General Partner—yet MTCHP never had attempted to pursue them until well after Farmhouse had filed suit in this matter. (*Id.* at 5.)

64. The Court accordingly will order specific performance pursuant to the terms of the Option set forth in Section 8.1 of the LPA based on the parties' substantial performance of their respective obligations under the LPA and to "serve the ends of justice[.]" *Double AA Corp. v. Newland & Co*., 905 P.2d 138, 141 (Mont. 1995) (quoting *Seifert*, 568 P.2d at 156).

## JUDGMENT & ORDER

1. The Court hereby declares that Farmhouse breached the LPA when Dabney assigned his interest in Farmhouse to Burrows without MHTCP's consent.

2. The Court further declares that Dabney's unauthorized assignment of his interest in Farmhouse to Burrows without MHTCP's consent did not

constitute a material breach of the LPA under Montana law as the parties substantially had performed their obligations under the LPA.

3. As a result, the Court declares that Farmhouse did not stand in material breach of the LPA when it timely provided notice to MHTCP of its intent to exercise the Option to purchase MHTCP's General Partner interest in the Bridger I Project and enters judgment on behalf of Farmhouse on this issue.

4. The Court orders specific performance of the Option Agreement pursuant to the terms of Section 8.1 of the LPA between Farmhouse and MHTCP as required by Montana law.

5. The Court further orders that each side shall bear its own fees and costs.

6. This judgment is final and disposes of all claims and all parties and shall be appealable.

7. Pursuant to Fed. R. Civ. P. 58, the Court orders that the Clerk of Court shall enter judgment by separate document according to the terms outlined above.

8. The Clerk of Court shall notify the parties of the making of this order.

DATED this 16th day of November, 2022.

Brian Morris
United States District Court Judge